UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY
1333 North Oracle Road
Tucson, AZ 85705,

Plaintiff,

v.

KEN SALAZAR,
Secretary of the Interior
1849 C Street, N.W.
Washington, D.C. 20240,

and

UNITED STATES FISH AND WILDLIFE SERVICE,
1849 C Street N.W.
Washington, D.C. 20240,

Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**I. INTRODUCTION**

1. Plaintiff Center for Biological Diversity ("the Center") brings this action under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, to compel the Secretary of the Interior (the "Secretary") and the United States Fish and Wildlife Service ( "FWS") (collectively, "Defendants") to make the required finding on the Center's petition to list the Mexican gray wolf as an endangered species or distinct population segment pursuant to the ESA.

2. The Mexican gray wolf (*Canis lupis baileyi*) is the smallest and southernmost subspecies of gray wolf in North America. Once found throughout large

areas of southeastern Arizona, southwestern New Mexico, western Texas, and the Sierra Madre Range in Mexico, Mexican gray wolves now exist only in captivity and as a small, precarious reintroduced population in the Apache National Forest in Arizona and New Mexico, and the Gila National Forest in New Mexico.

3. Gray wolves in the lower 48 states were listed as endangered under the ESA in 1978, but the FWS has designated wolves in the Great Lakes and northern Rocky Mountains regions as distinct population segments and has delisted these populations. These actions have left the status of the Mexican gray wolf uncertain; although it is nominally covered under the 1978 listing, the Mexican gray wolf is not listed as a separate entity under the ESA.

4. Accordingly, on August 11, 2009, the Center petitioned the Secretary to list the Mexican gray wolf as an endangered subspecies or distinct population segment. The ESA requires the Secretary "[t]o the maximum extent practicable" to make a finding on a listing petition within 90 days after receiving the petition as to whether the petition presents substantial scientific or commercial information indicating that the listing may be warranted. 16 U.S.C. § 1533(b)(3)(A). To date, the Secretary has not made this required finding.

5. The Center seeks declaratory and injunctive relief to enforce the ESA's mandated finding on the petition to list the Mexican gray wolf and to compel the Secretary to determine whether the Center's petition presents substantial scientific or commercial information indicating that the listing may be warranted.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 16 U.S.C. §§ 1540(c) and (g) (action arising under ESA citizen suit provision) and 28 U.S.C. §§ 1331 (federal question jurisdiction).

7. This Court may grant the relief requested under 28 U.S.C. §§ 2201 and 2202 (declaratory and injunctive relief), 16 U.S.C. § 1540(g) (ESA), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

8. Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants are officials and agencies of the United States acting in their official capacities and residing in the district, and because a substantial part of the events giving rise to the Center's claims occurred in this district.

9. The Center provided 60 days notice of their intent to file this suit pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(2)(C), by letter to Defendant Ken Salazar dated November 20, 2009. Defendants have not responded to the notice of intent to sue nor have the Defendants remedied the alleged violations. Therefore, an actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201. For all claims, the Center has exhausted all of the administrative remedies available to it.

## III. PARTIES

10. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit corporation with offices in San Francisco, Los Angeles, and Joshua Tree, California; Tucson and Flagstaff, Arizona; Portland, Oregon; Silver City, New Mexico; and Washington, D.C. The Center is actively involved in species and habitat protection

issues throughout North America and the Pacific. The Center has approximately 44,000 members, including members who reside in Arizona and New Mexico within the current and historic range of the Mexican gray wolf.

11. The Center's members and staff include persons with educational, conservation, scientific, moral, spiritual and aesthetic interests in the Mexican gray wolf. Center members and staff live and work in communities within or in close proximity to Mexican gray wolf habitat. They use, on a continuing and ongoing basis, these areas for educational, conservation, scientific, moral, spiritual and aesthetic purposes, including, but not limited to, aesthetic enjoyment, photography, nature study, and wildlife observation, and intend to continue this use in the future. The Center and its members further derive educational, conservation, scientific, moral, spiritual and aesthetic benefit and enjoyment from the existence of the Mexican gray wolves in the wild.

12. The Center and its members have participated in efforts to conserve the Mexican gray wolf and its essential habitat. Nonetheless, the Mexican gray wolf is at serious risk of extinction. Based on this concern, and to promote the conservation and recovery of Mexican gray wolves, including designation of critical habitat and recovery planning, the Center submitted the petition to list the Mexican gray wolf as an endangered subspecies or distinct population segment. Unless and until the Mexican gray wolf is protected under the ESA as an endangered subspecies or distinct population segment, its conservation and recovery is impaired and it will continue to be at grave risk of extinction. The Secretary's failure to comply with the ESA's deadlines for processing the Mexican gray wolf petition deprives the species of statutory protection vitally necessary to its survival. Therefore, the Center's members and staff are injured by the

Secretary's failure to make a timely determination as to whether the Center's petition presents substantial scientific or commercial information indicating that the listing may be warranted, as is required by the ESA. This injury caused by Secretary's failure to comply with the ESA is actual, concrete, and imminent. The declaratory and injunctive relief requested will fully redress the injury. The Center has no adequate remedy at law.

13. Defendant KEN SALAZAR is the Secretary of the Interior and is the federal official in whom the ESA vests final responsibility for making decisions and promulgating regulations required by and in accordance with the ESA, including proposed and final critical habitat decisions. Secretary Salazar is sued in his official capacity.

14. Defendant UNITED STATES FISH AND WILDLIFE SERVICE is the agency within the Department of the Interior that is charged with implementing the ESA for terrestrial species, including the Mexican gray wolf, as well as ensuring prompt compliance with the ESA's mandatory listing deadlines.

## IV. STATUTORY BACKGROUND

15. The ESA is a federal statute enacted to conserve species in danger of extinction and the ecosystems upon which they depend. 16 U.S.C. § 1531(b). The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978). The Supreme Court's review of the ESA's "language, history, and structure" convinced the Court "beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Id*. at 174. As the Court found, "[t]he plain intent of Congress in

enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

16. Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . ." 16 U.S.C. § 1531(b). To this end, the ESA section 4, requires that the Secretary protect such species by listing them as either "threatened" or "endangered," and by designating "critical habitat" for each species at the time the species is listed. 16 U.S.C. § 1533.

17. According to the ESA, a species as "endangered" if it is in "danger of extinction throughout all or a significant portion of its range" and "threatened" if it is "likely to become an endangered species within the foreseeable future…" 16 U.S.C. § 1532(6), (20).

18. Most of the ESA's conservation measures apply only when the Secretary lists a species as threatened or endangered. For example, section 7 of the ESA requires all federal agencies to "insure" that their actions neither "jeopardize the continued existence" of any listed species nor "result in the destruction or adverse modification" of a species' critical habitat. 16 U.S.C. § 1536(a)(2). Section 9 of the ESA prohibits, among other things, "any person" from intentionally taking listed species or incidentally taking listed species without a permit from the Secretary. 16 U.S.C. §§ 1538(a)(1)(B), 1539. Concurrently with listing, the Secretary must designate the species' critical habitat – areas essential to the conservation of the species. 16 U.S.C. §§ 1532(5)(A), 1533(a)(3)(A). Other provisions of the ESA require the Secretary to "develop and

implement" recovery plans for listed species, 16 U.S.C. § 1533(f), authorize the Secretary to acquire land for the protection of listed species, 16 U.S.C. § 1534, and make federal funds available to states to assist in their efforts to preserve and protect threatened and endangered species, 16 U.S.C. § 1535(d).

19. To ensure the timely protection of imperiled species, Congress set forth a detailed process whereby citizens may petition the Secretary to list a species as endangered or threatened. The process includes mandatory, non-discretionary deadlines that the Secretary must meet, so that species in need of protection do not languish in administrative purgatory. The three required findings, described below, are the 90-day finding, the 12-month finding, and the final listing determination.

20. Upon receipt of a listing petition, the Secretary must "to the maximum extent practicable, within 90-days" make an initial finding as to whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). If the Secretary finds that the petition *does not* present substantial information indicating that listing may be warranted, the petition is rejected and the process ends.

21. If, on the other hand, the Secretary determines that a petition *does* present substantial information indicating that listing may be warranted, the Secretary must then conduct a full scientific review of the species' status. 16 U.S.C. § 1533(b)(3)(A). Upon completion of this status review, and within 12-months from the date that he received the petition, the Secretary must make one of three findings: (1) listing is not warranted; (2) listing is warranted; or (3) listing is warranted, but presently precluded by other pending

proposals for listing species, provided certain circumstances are present. 16 U.S.C. § 1533(b)(3)(B).

22. If the Secretary's 12-month finding concludes that listing is warranted, the Secretary must then publish notice of the proposed regulation to list the species as threatened or endangered in the Federal Register for public comment. 16 U.S.C. § 1533(b)(3)(B)(ii). Within one year of the publication of the proposed regulation, the ESA requires the Secretary to render his final determination on the proposal. 16 U.S.C. § 1533(b)(6)(A). At such time, the Secretary must either list the species, withdraw the proposed listing rule or, if there is substantial disagreement about scientific data, delay a final determination for up to six months to solicit more scientific information. 16 U.S.C. §§ 1533(b)(6)(A)(i), 1533(b)(6)(B)(i).

23. It is critical that the Secretary follow scrupulously the ESA's listing procedures and deadlines if species are to be protected in a timely manner, because the ESA does not protect a species until it is formally listed as either endangered or threatened.

24. The ESA provides for listing of "species," but that term includes subspecies and "distinct population segments of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). Thus, the ESA provides that subspecies and distinct vertebrate population segments may be listed as distinct "species."

25. Section 10(j) of the ESA authorizes the Secretary to establish an "experimental population" of an endangered or threatened species where such population is "wholly separate geographically from nonexperimental populations of the same

species." 16 U.S.C. § 1539(j)(1). The Secretary may authorize the release of an experimental population outside the species' current range if he determines that the release will further the conservation of the species. 16 U.S.C. § 1539(j)(2)(A). Prior to authorizing the release of any experimental population, the Secretary must determine, on the basis of the best available information, whether the release of the experimental population is essential to the continued existence of the species. 16 U.S.C. § 1539(j)(2)(B). The ESA affords less protection to those experimental populations the Secretary determines to be not essential to the continued existence of the species, and critical habitat shall not be designated for such populations. 16 U.S.C. § 1539(j)(2)(C).

## V. FACTUAL BACKGROUND

### A. The Mexican Gray Wolf

26. The Mexican gray wolf, also known as the lobo, is the smallest and southernmost subspecies of gray wolf in North America, and is the most genetically and taxonomically distinct of extant gray wolves.

27. Mexican gray wolves are physically distinct from other North American gray wolves. Adults weigh 50 to 90 pounds, and reach 26 to 32 inches in height at the shoulder. In general, their skulls are less massive, dentition is lighter, and build more slender than other gray wolves. Mexican gray wolves are suited to their generally arid range, and may have adopted larger home ranges than other gray wolves to compensate for the sparser prey base

28. As a predator, the Mexican gray wolf contributes to the ecological fitness of prey species such as white-tailed deer, mule deer, elk, collared peccary, and bighorn sheep. Wolves also provide carrion for scavenger species such as eagles, badgers, and

bears. The presence of wolves may also subtly change the relationships between other species, such as foxes and coyotes, and between herbivores such as elk and the vegetation they utilize. In other regions, the restoration of gray wolves has been linked to increases in biological productivity and diversity.

29. The historic range of the Mexican gray wolf is not precisely known, but is believed to have consisted of the Sierra Madre Mountains in Mexico almost as far south as Mexico City, the Sky Island Mountains of northern Mexico, southeastern Arizona and southwestern New Mexico, far western Texas and potentially the Mogollon Plateau of Arizona and New Mexico. It is likely that there was considerable movement across the boundaries of this range, including intergradation with wolves to the north.

30. Breeding Mexican gray wolves were probably extirpated from the United States in the 1920s as a result of federal predator control activities, and wolf populations were not allowed to re-establish north of the Mexican border. The FWS initiated a program of poisoning wolves in Mexico; consequently, wolves were believed extirpated from Mexico by the 1990s. However, a captive population based on seven founding wolves captured in Mexico was maintained, and bred in three lineages that were merged beginning in 1995.

31. The Mexican gray wolf qualifies as a distinct population segment under the ESA according to FWS criteria. To be considered for listing as an endangered distinct population segment, a population must be "discrete" in "relation to the remainder of the species to which it belongs" and "significant" to the species to which it belongs. 61 Fed. Reg. 4722, 4725 (1996). The Mexican gray wolf population is "discrete" because it is markedly separate from other gray wolves because of geographic,

physiological, ecological and behavioral factors. This population is "significant" because it occurs in an unusual and unique ecological setting – the arid southwestern United States, which is markedly different from other settings occupied by North American gray wolves.

**B. Prior Administrative Determinations**

32. Mexican gray wolves were listed as endangered in 1976 (when there were probably none in the United States). 41 Fed. Reg. 17742.

33. In 1978, all gray wolves in the lower 48 states were listed as endangered, except wolves in Minnesota, which were listed as threatened. 43 Fed. Reg. 9607. The prior listing of the Mexican gray wolf was subsumed in the 1978 listing.

34. The gray wolf listing was modified in 2003 to include three distinct population segments – a Great Lakes population, a northern Rockies population, and a southwestern (Mexican grey wolf) population. 68 Fed. Reg. 15804. This rule was overturned on January 31, 2005. In 2009, the FWS issued rules designating distinct populations segments in the Great Lakes and northern Rocky Mountains and delisting these populations, but took no further action on listing of the Mexican gray wolf as either a subspecies or distinct population segment. The 1978 listing of gray wolves remains nominally in effect for areas outside of the Great Lakes and northern Rocky Mountains, but provides no special recognition for the Mexican gray wolf.

**C. Mexican Wolf Reintroduction**

35. Beginning in 1998, pursuant to section 10(j) of the ESA, an "experimental, non-essential" population of Mexican gray wolves was reintroduced into the Apache National Forest of Arizona and the Gila National Forest of New Mexico. The FWS

anticipated that this population would expand to over 100 wolves – including 18 breeding pairs – by the end of 2006. By the end of 2008, however, only 52 wolves, including two breeding pairs, remained in the wild.

36. For several reasons, the reintroduced Mexican gray wolf population has not reached its anticipated population numbers. Repeated federal predator control, in response to actual or reported wolf predation on livestock, has suppressed the population. Eleven wild Mexican gray wolves have been shot by federal authorities for predator control purposes since reintroduction began. Another 18 wolves have died inadvertently due to capture attempts. Thirty-seven wolves have been recaptured and returned to captivity indefinitely; nine of those have died in captivity, and most of the remainder will never be released. Dozens of other wolves have been recaptured and returned to the wild, but often in unfamiliar surroundings and with a reduced chance of survival.

37. This population suppression for predator control has accelerated the onset of inbreeding in this small population, including through the shooting of a wolf known to be genetically irreplaceable. Ongoing inbreeding depression is causing small litter sizes, low body weight, and possible infertility among male wolves. Predator control thus directly impairs recovery of the Mexican gray wolf.

38. Since the Mexican wolf reintroduction program commenced, 32 wolves have been killed by poachers and another 12 have been struck and killed by vehicles. These losses within the already diminished reintroduced population further impair recovery of the Mexican gray wolf.

39. There have thus been an estimated 73 human-caused wolf deaths since reintroduction began, while a total of 100 captive-born wolves have been released in the

wild. The high rate of human-caused mortality has prevented the Mexican gray wolf from reaching the population objective and breeding pair projections set by the FWS, and has also rendered the reintroduced population vulnerable to imminent extinction from genetic factors or due to chance events.

40. In addition to direct killing by humans, Mexican wolves are threatened by a variety of factors, including the destruction and fragmentation of their native habitat, livestock grazing in the Apache and Gila National Forests, road construction, and disease.

**D. The Center's ESA Listing Petition**

41. Although nominally protected by the 1978 listing, the lack of a separate listing for Mexican gray wolf leaves them without clear legal protection. In particular, the FWS is not required to develop or update a recovery plan for the Mexican gray wolf, or designate critical habitat. Furthermore, the entire reintroduced population is considered an experimental population that is not afforded the full protection of the ESA, including the ESA's prohibition of intentional and incidental take. In the absence of these clear regulatory protections, the FWS has often yielded to political pressure and trapped or shot wolves, which along with self-imposed limits on releasing them to the wild, has further imperiled the subspecies. Listing the Mexican gray wolf as an endangered subspecies or distinct population segment is necessary to promote the conservation and recovery of this subspecies.

42. On August 11, 2009, the Center submitted a petition to the Secretary requesting listing of the Mexican gray wolf as an endangered subspecies or distinct population segment. The Secretary received the Center's petition electronically on the same day.

43. The Center's petition presents considerable scientific evidence that the Mexican gray wolf is a distinct population segment that qualifies for endangered status pursuant to the ESA due to the threat of extinction posed by human-caused wolf killing, habitat loss, livestock grazing, disease, and other threats.

44. The Secretary missed the November 9, 2009 deadline for issuing the required 90-day finding on the Center's petition as to whether the petition presents substantial scientific or commercial information indicating that the listing may be warranted. By letter dated November 20, 2009, the Center notified the Secretary that he had violated section 4(b)(3)(A) of the ESA, 15 U.S.C. § 1533(b)(3)(A), by failing to make the 90-day finding on the petition as required by the ESA. With this letter, the Center advised the Secretary that it intended to file suit to enforce the ESA's mandatory listing deadlines.

45. The Secretary has yet to issue the 90-day finding on the Center's petition to list the Mexican gray wolf as an endangered subspecies or distinct population segment under the ESA.

## VI. CLAIM FOR RELIEF

### (Failure to Make a Timely 90-Day Finding)

46. Each and every allegation set forth in paragraphs 1 through 45 is incorporated herein by reference.

47. The Secretary's failure to make a timely 90-day finding on the Center's petition to list the Mexican gray wolf as an endangered subspecies or distinct population segment violates the ESA. 16 U.S.C. §§ 1533(b)(3)(A); 1540(g). The Secretary's failure to perform his mandatory, non-discretionary duty also constitutes agency action

"unlawfully withheld or unreasonably delayed" within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1). Additionally, and/or alternatively, the Secretary's failure to comply with this provision is arbitrary and capricious, an abuse of discretion, not in accordance with law, and a failure to observe proper procedure under the APA, 5 U.S.C. § 706(2).

## VII. PRAYER FOR RELIEF

WHEREFORE, the Center respectfully requests that this Court enter judgment providing the following relief:

(1) Declare that Defendants violated the ESA and/or APA by failing to issue a timely 90-day finding on the Center's petition to list the Mexican gray wolf as an endangered subspecies or distinct population segment;

(2) Order the Secretary to issue a finding forthwith as to whether the Center's petition presents substantial scientific or commercial information indicating that the listing may be warranted FWS has determined whether the listing is warranted. 16 U.S.C. § 1533(b)(3)(A);

(3) Grant the Center its fees, costs, expenses and disbursements, including reasonable attorneys' fees; and

(4) Grant the Center such additional and further relief as the Court deems just and proper.

Dated: January 26, 2010.

Respectfully submitted,

Amy Atwood (DC Bar No. 470258)

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211-0374
Telephone: (503) 283-5474
Facsimile: (503) 283-5528
Email: atwood@biologicaldiversity.org

John Buse (CA Bar No. 163156)
*pro hac vice* application pending
CENTER FOR BIOLOGICAL DIVERSITY
351 California Street, Suite 600
San Francisco, CA 94104
Telephone: (323) 533-4416
Facsimile: (415) 436-9683
Email: jbuse@biologicaldiversity.org

Attorneys for Plaintiff